## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

Norick, Inc.,                                      No. 22-cv-1648 (KMM/JFD)

          Plaintiff,

v.                                                              **ORDER**

Hays Companies, Inc.,

          Defendants.

Norick, Inc. and Hays Companies, Inc. ("HCI") are insurance brokerage firms—among other things, they represent business clients in obtaining the insurance coverage best suited for their needs. In 1994, Norick and HCI's predecessor-in-interest entered a business arrangement where they would occasionally solicit and service business clients together, and for that shared business they agreed to split the revenue that was generated. That relationship operated without incident for many years, until recently. HCI shared revenue with Norick on an account for Summit Fire Protection Company ("Summit") since the early 2000s, but in September 2021, HCI stopped sending Norick its expected share of the revenue. Norick brought this lawsuit in June 2022, seeking a declaratory judgment and damages, asserting claims of breach of contract and promissory estoppel. The parties filed cross-motions for summary judgment, and the Court held a hearing on June 27, 2023. At the hearing, the Court denied HCI's motion for summary judgment and took Norick's motion under advisement. As set forth below, Norick's motion is granted in part and denied in part.

## BACKGROUND

Norick is a Minnesota insurance brokerage corporation founded in 1993 by Rick Glasgow and Norm Hagen. Shortly thereafter, Jim Hays formed his own insurance brokerage firm known as Hays Companies, which he co-owned with Bill Mershon. Before the two companies were formed, Glasgow, Hagen, Hays, and Mershon all knew each other, formed friendships, and, save for the disagreements associated with this case, appear to remain friends today.

Although their businesses never formally merged, the principals entered an arrangement they described as a partnership. On August 14, 1994, Glasgow, Hagen, Hays, and Mershon all signed a document—the "1994 Memorandum"—outlining the business arrangement between Norick and Hays Companies. The 1994 Memorandum, reproduced in full below, provides that Norick and Hays Companies would share office space, and Norick would pay its own costs and maintain all its existing relationships. However, the 1994 Memorandum indicates that there would be shared revenue on "NEW BUSINESS WRITTEN," which would be "Split 60% for Sales/40% for Marketing," while "Policy Ownership Resides with [the] Producer." If either business sold and marketed an account entirely on its own, that company would keep 100% of the revenue generated. But if, for example, Hays Companies were to "sell" a shared account and Norick "marketed" the account, Hays Companies would receive 60% of the revenue for selling the account, and Norick would get 40% for marketing it, and vice versa.

```
                    NORICK RISK FUNDING CONCEPTS
                  3500 West 80th Street   Suite #150
                        Minneapolis, MN  55431
               PH: 612-896-3752      FAX: 612-835-4058
                             MEMORANDUM
       DATE:  AUGUST 15, 1994

       TO:    JIM/BILL            AT: HAYS GROUP
       FROM:  NORM/RICK           AT: NORICK

       RE:    A BUSINESS PARTNERSHIP

            This memo expands a bit on the conversations we've had
       in the last day or so and outlines our working partnership as
       we see it.

       OWNERSHIP>>>>>> NORICK RISK FUNDING CONCEPTS: (Hagen/Glasgow)
                       THE HAYS GROUP: (Hays, Mershon and Others)

       HAGEN/GLASGOW>> NORICK RISK FUNDING CONCEPTS
       OPERATE AS:      (Independent Contractor to Market/Service
                         HAYS GROUP Property/B&M/Marine Business)

                        NORICK:
                        _RETAINS ALL ITS OWN REVENUE
                        _PAYS ALL HAGEN/GLASGOW COSTS
                         (Including Additional Staff as Required)
                        _MAINTAINS ALL CURRENT RELATIONSHIPS
                         (Banking/Payroll/401(k)/Accounting/Etc)
                        _OFFICES WITH HAYS GROUP
                         (Pays Allocated Rent/Utility Costs)
                        _SHARES REVENUE ON NEW BUSINESS WRITTEN
                         (Split 60% for Sales/40% for Marketing)
                         (Policy Ownership Resides with Producer)

                          Company Shares
                      (From Standpoint of Revenue & Cashflow)
                      HAYS GROUP                      NORICK

                        100%       <--Sell&Mkt           0%
                         60%       <--Sell Mkt-->       40%
                         40%       <--Mkt Sell-->       60%
                          0%           Sell&Mkt-->     100%


            The HAYS GROUP will build out & furnish the office space
       and arrange for rollover phone answering and emergency typing
       and clerical until such time NORICK staff additions are made.
       All revenue for HAYS GROUP business is the property of the
       HAYS GROUP and NORICK will be compensated on revenue sharing
       basis per the schedule above.  Similarly, NORICK collects
       revenue for its own business and pays HAYS GROUP for casualty
       marketing and service on the same revenue sharing schedule.
```

Jim Hays          Bill Mershon          Norm Hagen          Rick Glasgow

[Markowitz Decl., Ex. A ("1994 Memorandum"), Dkt. 46-1.]

The 1994 Memorandum does not define the terms "Sales," "Sell," "Producer," or Marketing." According to Norick's principal, Mr. Glasgow, under the 1994 Memorandum, "selling" an account meant that either Hays Companies or Norick had been responsible for receiving the order from the client, or originating the business. [Markowitz Decl., Ex. B ("Glasgow Dep.") 44:13–46:9, Dkt. 46-2.]

3

Mr. Hays and Mr. Mershon did not specifically recall having seen or executing the 1994 Memorandum. [Markowitz Decl., Ex. C ("Hays Dep.") 14:20–15:13; Markowitz Decl., Ex. D ("Merhson Dep.") 14:14–15:6.] However, Mr. Hays acknowledged that in general, in the insurance industry, when a broker "markets" an account, they service the account by dealing with the underwriter or the service provider, taking care of day-to-day activities like obtaining additional coverage based on changed conditions, and "finding an underwriter who will take the risk for the dollars they want." [Hays Dep. 16:22–17:14.] Mr. Hays also acknowledged that in the insurance industry the word "sell" means to originate an account. He described that work as "making contact with a customer and allowing us to put together a package to see if we could get them to move the business to us." [Hays Dep. 17:15–23.] Mr. Mershon generally agreed with that characterization. [Mershon Dep. 20:13–22:22; *see also* Markowitz Decl., Ex. G ("Little Dep.") 22:13–23:2 (agreeing that "Norick is the seller, predecessor is the marketer and the servicer of the Summit Account").]

Nevertheless, Mr. Hays said that in the context of the relationship between Norick and Hays Companies he believed the "sell" term and the concept of "originating" an account required an ongoing relationship between the company that brought the business into the partnership and the client, and went beyond simply bring in the contract. [Hays Dep. 19:24–21:17, 23:13–25:20.] Mr. Mershon similarly suggested that a "seller" would need to continue to have a relationship with the client throughout the business arrangement to be entitled to the 60% share of the revenue. [*See* Mershon Dep. 25:8–18.]

After the execution of the 1994 Memorandum, Norick and Hays Companies obtained several shared clients and allocated revenue on these shared accounts according to the splits outlined in the agreement. In fact, they had over 100 shared clients from 1994 through the present. [Glasgow Dep. 165:6–9.] Hays Companies collected all revenues on shared accounts, regardless of who was the "seller" and who was the "marketer." [Hays Dep. 74:11–15; Glasgow Dep. 166:3–12.] For most of the shared accounts, Hays Companies originated the business (sales), and Norick serviced the accounts (marketing). [Glasgow Dep. 165:10–17.] There were a few instances over the years where Norick had serviced accounts originated by Hays Companies, and the client later asked for Norick to be removed from the day-to-day handling of the business, but outside of those circumstances, the parties never failed to share revenues on shared accounts as set forth by the 1994 Memorandum. [Hays Dep. 36:5–18; Mershon Dep. 60:23–61:7, 72:11–22.]

### The Summit Account

In May 2003, Con Elfes, a former Norick employee, solicited business from Summit, possibly by cold-calling the company. Mr. Elfes managed to secure the Summit account on Norick's behalf. [Glasgow Dep. 39:3–21, 74:24–75:7; Little Dep. 12:24–13:6, 22:13–18.] After landing the Summit account, it is unclear whether Mr. Elfes did any work or had any ongoing contact with Summit whatsoever for several years, but nobody from Norick other than Mr. Elfes ever communicated with Summit. [Little Dep. 13:16–21; Glasgow Dep. 73:13–74:17, 77:17–78:13; Hays Dep. 73:4–6; Mershon Dep. 67:7–15.] After Norick originated the Summit account, there is no dispute that Hays Companies handled all the marketing and servicing of the account. [Glasgow

Dep. 48:11–14.] After Mr. Elfes left Norick in 2008, Hays Companies (or its successor) continued to handle the marketing and servicing of the Summit account exclusively for the entire period relevant to this case. [Little Dep. 13:25–14:14; Glasgow Dep. 73:16–19, 79:7–80:3.]

Although Norick's only involvement with the Summit account entailed originating the business opportunity and Hays Companies had been exclusively responsible for the day-to-day servicing and marketing of the business, Hays Companies always shared the Summit revenue it collected with Norick, and that division usually followed the 60/40 breakdown set out in the 1994 Memorandum. [Hays Dep. 36:5–18; 60:19–61:7.] For a significant period, this meant that although Hays Companies did all of the work on the account, it was paying Norick 60% of the revenue generated on the Summit business. Over the years, the Summit account continued to grow, so Hays Companies had to increase staff and commit significant resources to provide Summit quality services. [Glasgow Dep. 110:12–111:1; Little Dep. 34:3–7.] Understandably, this state of things unsettled Hays Companies.

Roughly seven years into the Summit account, Hays Companies asked Norick to agree to change the 60/40 commission-sharing arrangement to a 50/50 split for that account to help offset Hays Companies' increased costs.[1] [Glasgow Dep. 110:12–111:1,

---

[1] The record is not entirely clear on how this exchange occurred though Mr. Glasgow thought that Mr. Mershon had reached out to Mr. Hagen to request a modification of the revenue-sharing arrangement on the Summit account. There is, however, no dispute that after a certain point the parties stopped sharing revenues on a 60/40 split and began splitting the revenues 50/50.

113:7–17.] Mr. Glasgow explained that Norick orally agreed to this modification of the arrangement for the Summit account and accepted that division of revenue for all payments from some point in 2010 through September 2021 (when the revenue sharing eventually stopped). [*Id.* 110:12–111:1.] There was no written documentation of the change Mr. Glasgow described, but "subsequently issued production reports and commission payable statements" reflect that the revenues on the Summit account were split evenly between the two companies for more than a decade. [*Id.* 113:18–1; *see also* Hays Dep. 75:8–24 (explaining that Hays Companies commission payable statements would be a reliable source of information about revenue sharing between the parties); Markowitz Decl., Ex. E ("Lewis Dep.") 33:17–22 (describing a commission payable statement), Dkt. 46-5.]

Defendant's principals' testimony and its internal communications confirmed this modification as well. Mr. Mershon testified that "the parties agreed to change the split to 50-50," and Mr. Hays did not disagree. [Mershon Dep. 69:9–12; Hays Dep. 74:22–75:1.] In 2016, when Tim Broberg, Hays Companies' President of Minnesota Property & Casualty, questioned paying Norick 50% commission for the Summit account, Mr. Mershon explained: "They produced it. They own it." [Markowitz Decl., Ex. O.]

In August 2017, Summit was in the process of being acquired by a private equity firm. [Digre Decl., Ex. 1 at 1, Dkt. 58-1.] The private equity firm told Summit that when acquiring companies, they insisted that insurance and surety programs be handled by a specific brokerage firm, Lockton. [*Id.*] However, Summit "pushed to keep Hays Companies involved in their insurance and surety program" given the longstanding

relationship and Hays Companies' "excellent service." [*Id.*] The equity firm made an exception to its typical approach and allowed Summit to continue its relationship with Hays Companies. [*Id.*]

In 2018, "a diversified insurance agency, wholesale brokerage, insurance programs and service organization" called Brown & Brown purchased Hays Companies. At that point, Hays Companies ceased to exist as a legal entity. [Markowitz Decl., Ex. Q at 3, Dkt. 46-17; Hays Dep. 13:8–19.] Brown & Brown acquired all of Hays Companies' assets and liabilities in 2018. [Def.'s Ans., ¶ 11, Dkt. 34.] HCI is a wholly owned subsidiary of Brown & Brown. [*Id.* ¶ 4.] After Brown & Brown's acquisition of Hays Companies, HCI continued to service the Summit account and continued to remit payments to Norick until September 15, 2021. [*Id.* ¶¶ 29, 30; Markowitz Decl., Ex. N.] On September 15, 2021, Summit was sold to another private equity firm, and Mr. Boberg determined this would be an appropriate date to terminate the revenue-sharing arrangement between the parties. [Digre Decl., Ex. 1 at 2–3.]

## DISCUSSION

Norick seeks summary judgment in its favor on Count I of its Second Amended Complaint for breach of contract and Count IV, which seeks a declaratory judgment.[2] The arguments for both overlap. Norick argues there is no genuine dispute that the parties formed a binding agreement with the 1994 Memorandum; the contract applies to the

---

[2] Norick did not seek summary judgment in its favor on its claim for promissory estoppel. [Second Am. Compl. (Count II), Dkt. 31.]

Summit account; the parties agreed to modify the revenue-sharing arrangement with respect to the Summit funds and share them 50/50; and HCI breached the parties' agreement when it stopped remitting payments to Norick in September 2021. Finally, Norick argues that the Court should order specific performance of the 1994 Agreement requiring HCI to pay Norick 50% of all revenue on the Summit account from September 2021 for as long as Summit remains its client.

## I.     Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587–88 (1986); *Irvin v. Richardson*, 20 F.4th 1199 (8th Cir. 2021).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge. . . ." *Nunn v. Noodles &*

*Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

## II.     Breach of Contract

To establish its breach-of-contract claim under Minnesota law, Norick must prove

three elements: "(1) formation of a contract, (2) performance by plaintiff of any

conditions precedent to his right to demand performance by the defendant, and (3) breach

of the contract by defendant." *Placzek v. Mayo Clinic*, 18F.4th 1010, 1016 (8th Cir. 2021)

(quoting *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn.

2014)). The parties dispute each element.

### A.  Formation

When deciding whether parties intended to form a contract under Minnesota law,

courts look at the objective manifestations of the parties' words and acts. *Petsche v. EMC*

*Morg. Corp.*, 839 F. Supp. 2d 663, 669 (D. Minn. 2011) (quoting *Hill v. Okay Const. Co.,*

*Inc.*, 252 N.W.2d 107, 114 (Minn. 1977). Forming a contract "requires communication of

a specific and definite offer, acceptance, and consideration." *Id.* (quoting *Commercial*

*Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006)).

"Vague language or subjective intentions do not form the basis of a specific and definite

offer." *Wright v. Capella University, Inc.*, 378 F. Supp. 3d 760, 773 (D. Minn. 2019)

(citing *Hunt v. IBM Mid Am. Emps. Fed. Credit Union*, 384 N.W.2d 853, 857–58 (Minn.

1986)).

Viewing the evidence in the light most favorable to the Defendant, the Court agrees that reasonable jurors could reach only one conclusion from the evidence—that the parties formed an enforceable agreement when they executed the 1994 Memorandum. Admittedly, there is some language introducing the 1994 Memorandum that could suggest the parties did not intend to form a contract. Just beneath the "Re:" line, the document states: "This memo expands a bit on the conversations we've had in the last day or so and outlines our working partnership as we see it." [1994 Memorandum.] However, this statement precedes a document that lays out specific and definite terms that objectively show the parties intended to form a contract.

Read as a whole, the 1994 Memorandum is not some inchoate memorandum of understanding. The 1994 Memorandum contains mutual exchanges of specific offers between Hays Companies (referred to as "Hays Group") and Norick. For example, Hays Companies offers or promises to build out, furnish, and share its office space; arrange for rollover and phone answering and temporary emergency typing services for Norick; and share revenues according to the schedule that the parties worked out for selling and marketing of accounts. Norick offers to share revenues according to the same schedule; act as an independent contractor for Hays Companies' Property, B&M, and Marine Business; and otherwise handle Norick's own business. The exchange of these mutual promises is consideration. *See Cedarstrand v. Lutheran Bhd.*, 117 N.W.2d 213, 220 (Minn. 1962) (describing consideration as "the voluntary assumption of an obligation by one party upon condition of an act or forbearance by the other").

11

In addition, the signatures of the owners and founders of the two businesses indicate acceptance of the 1994 Memorandum's terms and objectively manifests their intent to bind their respective companies to those terms. HCI pointed the Court to no evidence to suggest that the objective evidence of its principals' agreement to the terms of the 1994 Memorandum was anything other than genuine.

HCI's remaining arguments to the contrary do not change this conclusion.[3] HCI contends that Norick's motion should be denied because the evidence shows there was no meeting of the minds on essential terms, including: (1) the duration of the arrangement purportedly created by the 1994 Memorandum; (2) the manner in which its terms could be modified; and (3) when and by what means the arrangement could be terminated. But HCI cites no case holding that the absence of such terms renders a contract unenforceable or indicates that the parties did not intend to form a contract. In its brief in support of its

---

[3] HCI also argues that the 1994 Memorandum is not an enforceable contract because there was no "meeting of the minds" on an essential term, namely what it means for one party or the other to "sell" for purposes of the revenue-sharing arrangement that is "Split 60% for Sales/40% for Marketing." Although HCI couches this argument as one of contract formation, and courts applying Minnesota law have sometimes used terminology concerning objective manifestations of mutual assent and "meeting of the minds" in confusing ways, the Court believes HCI's argument is better construed as one regarding contract interpretation. *See Field-Martin Co. v. Fruen Mill. Co.*, 298 N.W 574 (Minn. 1941) (explaining that the parties' "expression of . . . mutual assent" rather than their "meeting of minds" is the "culmination of the contract-making process"); *cf. SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011) ("Mutual asset entails a meeting of the minds concerning a contract's essential elements."). Here, HCI essentially contends that the evidence would allow a reasonable jury to conclude that its construction of "sell" is reasonable and Norick's is not. The Court addresses that issue below. To the extent HCI suggests otherwise, the Court finds that the existence of ambiguity in the contract's revenue-sharing terms does not mean that the parties failed to form a contract.

own motion for summary judgment, HCI cited *Minneapolis Cablesystems v. City of Minneapolis*, 299 N.W.2d 121 (Minn. 1980) for the proposition that the absence of terms concerning the 1994 Memorandum's duration or how it could be terminated indicate that essential terms for contract formation were missing. But *Minneapolis Cablesystems* holds only that the alleged contract failed to indicate an intent to be bound because it explicitly stated that the city had the option to veto any agreement before the final adoption of a franchise ordinance. *Id.* at 122–23.

Accordingly, the Court finds that there is no disputed issue of fact for trial with respect to the first element of Norick's breach-of-contract claim—the parties formed a contract.

### B. Condition Precedent

The parties next dispute whether Norick has shown that it performed all conditions precedent to its right to demand that HCI continue sharing revenues on the Summit account. "Under Minnesota law, a condition precedent is a contract term that calls for the performance of some act or the happening of some event after the contract is entered into, and upon the performance or happening of which the promisor's obligation is made to depend." *Citizens Ins. Co. of Am. v. Assessment Sys. Corp.*, No. 18-cv-01762 (SRN/ECW), 2019 WL 4014955, at *6 (D. Minn. Aug. 26, 2019) (cleaned up). "No special terms are necessary to create a condition precedent, but there must be some language that indicates the agreement, or its terms, are conditions upon *some event*." *Id.* at *7 (quoting *Lewis v. Borchert*, Nos. A14-0379, A14-0564, 2015 WL 133992, at *9 (Minn. Ct. App. Jan. 12, 2015)) (emphasis from *Citizens Ins.*).

HCI argues that Norick has failed to demonstrate that it fulfilled all conditions precedent to demand performance of HCI's revenue-sharing obligations under the 1994 Memorandum because the evidence does not establish that Norick "sold" the Summit account. Norick disagrees with HCI's characterization of "selling" as a condition precedent under the 1994 Memorandum, but argues that "regardless, Norick is the 'seller' because it originated/brought in the Summit Account." [Dkt. 64 at 5–6.] Given Norick's position, the Court finds it unnecessary to engage in a lengthy analysis of whether "selling" is or is not a condition precedent under the agreement. Even if it is, the parties' dispute comes down to the proper construction of "Sell" or "Sales."

### C. Construction of "Sell"/"Sales"

The purpose of contract interpretation is to give effect to the intent of the parties. *Qwinstar Corp. v. Anthony*, 882 F.3d 748, 754 (8th Cir. 2018). When that intent is clear from the face of the agreement, the "construction of the contract is a question of law for the court." *Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 395, 369 (Minn. 2005). "A court ascertains the parties' intent by putting itself in the parties' positions at the time they formed the contract and determining what they reasonably meant to accomplish in view of the contract as a whole, its plain language, and the surrounding circumstances." *Qwinstar*, 882 F.3d at 754 (quoting *Ecolab, Inc. v. Gartland*, 537 N.W.2d 291, 295 (Minn. Ct. App. 1995)). Under Minnesota law, unambiguous terms in a contract "are given their plain, ordinary, and popular meaning." *Ritrama, Inc. v. HDI-Gerling Am. Ins. Co.*, 796 F.3d 962, 966 (8th Cir. 2015) (quoting *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009)) (cleaned up).

However, a contract is ambiguous when it its language is reasonably susceptible to more than one interpretation. *Thomsen v. Famous Dave's of Am., Inc.*, 606 F.3d 905, 908 (8th Cir. 2010). Whether or not a contract's terms are ambiguous is a question of law for the court. *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 818 F.3d 356, 361 (8th Cir. 2016). Courts should first attempt to resolve an ambiguity by looking at the surrounding contract language because contracts must be construed as a whole. *Id.* at 362 (citing *Boe v. Christlieb*, 399 N.W.2d 131, 133 (Minn. Ct. App. 1987)). If the contract is ambiguous, extrinsic evidence becomes relevant, "and construction of the contract is a question of fact for the jury unless such evidence is conclusive." *Thomsen*, 606 F.3d at 908 (citing Donnay v. Boulware, 144 N.W.2d 711, 716 (Minn. 1966)). When extrinsic evidence is "conclusive and undisputed," a court may determine a contract's meaning as a matter of law. *Guercio v. Prod. Automation Corp.*, 664 N.W.2d 379, 385 (Minn. Ct. App. 2003) (internal quotation marks omitted); *see also Cherne Contracting Corp. v. Marathon Petroleum Co., LLC*, 578 F.3d 735, 740 (8th Cir. 2009) ("That is not to say, however, that the existence of . . . ambiguities in written contracts[] necessarily preclude summary judgment.").

HCI argues that the language of the 1994 Memorandum plainly and unambiguously provides that if one party did all the work on an account, it would be entitled to 100% of the revenue on that account. According to HCI, the undisputed evidence shows that HCI did all the work on the Summit account after Con Elfes contacted Summit in 2003 and originated the business opportunity. Therefore, under HCI's interpretation, HCI owed nothing to Norick at all. HCI raised this same plain-

language argument in support of its own summary judgment motion, which the Court denied at the June 27, 2023 hearing. To the extent the Court's previous ruling on HCI's motion did not explicitly reject this argument, the Court does so now. The 1994 Memorandum does not define the term "Sell" or "Sales," and neither the plain and ordinary meaning of those words,[4] nor the context of the parties' relationship leads to a sole reasonable interpretation of those contract terms. Read as a whole, the contract does not plainly apply in the way that HCI suggests.

Norick concedes that the agreement is ambiguous as to the meaning of "sell" and "sales." The Court agrees that these terms are reasonably susceptible to more than one reasonable interpretation, even when considering the surrounding language in the contract and the overall context of the parties' relationship. One could review the entire agreement and reasonably conclude that "sell" and "sales" mean what Norick suggests they do—that the parties understood "sell" and "sales" referred to business origination alone because they placed significant value on such origination and determined that the "seller"/originator of an account would continue to benefit from having landed it even though its counterpart was responsible for the day-to-day marketing and servicing work.

---

[4] Among other definitions, "sell" means to "exchange or deliver for money or its equivalent" or "to be responsible for the sale of." The American Heritage Dictionary, Second College Edition 1114 (1982). Similarly, "sale" is defined as the "exchange of goods or services for an amount of money or its equivalent," and "an instance of selling property." *Id.* at 1085. These definitions do not answer the question, one way or the other, whether the "seller" of an account was required to continue maintaining some ongoing relationship or performing any particular kind of work on an account to qualify for the 60% commission set forth in the 1994 Memorandum's revenue-sharing schedule.

One could also review the entire agreement and reasonably conclude that the parties intended for "sell" and "sales" to have a meaning requiring ongoing work, perhaps involving pitching new business to a client post-origination or maintaining an ongoing relationship with the client, in addition to the marketing and servicing work that the other party was performing. Accordingly, the Court finds that the meaning of "sell" and "sales" in the 1994 Memorandum is ambiguous.

Although the construction of an ambiguous contract is ordinarily a fact question for the jury, this is the unusual case in which the relevant extrinsic evidence is undisputed and conclusive such that the meaning of these terms can be determined as a matter of law. Even when viewed in the light most favorable to HCI, the extrinsic evidence conclusively establishes that the parties understood "sell" and "sales" in the 1994 Memorandum to mean the origination of business opportunities, and did not require the seller to continue performing any ongoing work.

When courts consider the meaning of ambiguous terms at summary judgment to ascertain the parties' intent, courts "look[] at the surrounding circumstances and the parties' own subsequent conduct." *Loftness*, 818 F.3d at 362 (quoting *Fredrich v. Indep. Sch. Dist. No. 720*, 465 N.W.2d 692, 695 (Minn. Ct. App. 1991)). "The most probative evidence is the actions of the parties afterwards." *Id.* (quoting *Fredrich*, 465 N.W.2d at 695).

With respect to the surrounding circumstances, the evidence demonstrates a common understanding among the parties that to "sell" means to originate business. Mr. Glasgow testified that was Norick's understanding, but that evidence does not stand

alone. Mr. Hays acknowledged that in the insurance brokerage industry, there are distinct meanings for "marketing" and "selling" an account. He described marketing an account as servicing the client by dealing with the underwriter or the service provider and handling day-to-day activities, such as obtaining additional coverage based on changed circumstances and finding an underwriter to provide the desired coverage at the client's desired price. In contrast, he agreed that "selling" generally referred to originating an account by doing things like making contact with a customer to pitch that client's business to see if the client would move the business to the broker. Mr. Mershon agreed with that characterization, and HCI's corporate representative testified that "Norick is the seller, [Hays Companies] is the marketer and the servicer of the Summit Account." [Little Dep. 22:13–23:2.]

Turning to the "most probative evidence," *Loftness*, 818 F.3d at 362, the actions of the parties after the contract was formed are even more conclusive. Again, there is no evidence indicating that after Con Elfes originated the business, Norick performed any day-to-day servicing or marketing (or any other work of any kind) on the Summit account. Defendant has not presented any evidence to suggest that Mr. Elfes had any contact with Summit after he originated the account. Instead, the evidence shows that Hays Companies (and later HCI) performed all of the servicing work on the Summit account from after it was brought into the partnership until September 2021, when Defendant stopped sharing revenues with Norick. [Little Dep. 13:25–14:2.] Yet there is no dispute that Defendant always shared revenue on the Summit account even though Norick performed no additional work.

The agreement provides that Norick "SHARES REVENUE ON NEW BUSINESS WRITTEN (Split 60% for Sales/40% for Marketing")." [1994 Memorandum.] And Defendant does not dispute that it paid Norick 60% of the revenue it collected from the Summit account (at least until the parties modified the revenue-sharing to a 50-50 split). Mr. Hays testified that the Defendant always shared Summit revenues with Norick, and he agreed that commission payable statements and production reports would reflect those payments. [Hays Dep. 73:24–75:20; *E.g.*, Markowitz Decl., Ex. H.] A demonstrative prepared by Norick's counsel summarizing the contents of those financial statements confirms that Defendant shared Summit revenues with Norick consistent with the parties' agreement for almost two decades. [Markowitz Decl., Ex. I.]

Other evidence of the parties' conduct demonstrates no genuine dispute for trial regarding the meaning of the terms "sell" and "sales." Mr. Mershon testified that the parties agreed to change the split to 50-50, and there is no evidence indicating any genuine dispute that such a modification, in fact, took place. Nor is there any evidence that, at the time of the renegotiation, either side expressed confusion about what Norick was required to do to earn its cut. After the parties made that change, HCI's internal communications revealed that some of the Defendant's personnel occasionally questioned why HCI was paying Norick 50% of the Summit revenue when Norick performed no work on the account. For example, in June 2016, Tim Boberg responded to an email from Lee Johnson asking if it was okay to pay Norick a commission for May of more than $24,000. Boberg asked Mr. Mershon, "Wow. We really pay norick 50% for

summit?" [Markowitz Decl., Ex. O.] Mr. Mershon explained, "They produced it. They

own it."[5] [*Id.*]

In April 2017, Mr. Johnson again asked Mr. Boberg if it was okay to pay Norick a

50% commission on a new policy that Summit added, and Boberg approved the payment.

[Markowitz Decl., Ex. M.] By April 2019, Mr. Boberg appeared to have second thoughts

about the arrangement and expressed them in an email:

> As a reminder, here are the accounts norm thinks we should
> be transacting on.
>
> ....
>
> 2.  Summit.   he made the intro to us 184 years ago. Hasn't
>     been involved for 183. They were recently purchased by a
>     PE and we were at risk of losing them to the portfolio. the
>     summit boys saved us because of their relationship with
>     lynne and lori. It's grown exponentially because the PE
>     guys are giving them money to make acquisitions. I'm not
>     suggesting we back off the original agreement with norm,
>     but this thing is now massive and it stings to pay them
>     50%.

[Markowitz Decl., Ex. K at 2.] But even this expressed frustration demonstrates that

Mr. Boberg believed HCI to be bound by the agreement.

Mr. Hays passed along the message to Mr. Mershon, who eventually said that he

had discussed "[p]possible solutions" with Mr. Hagen, but they "agreed to nothing." [*Id.*]

---

[5] Mr. Mershon's reference to Norick *producing* and *owning* the Summit account
reflects the valuation placed by the parties on origination of business in the 1994
Memorandum.  In three clearly related lines of text, the contract indicates that Norick:
"SHARES REVENUE ON NEW BUSINESS WRITTEN/(Split 60% for Sales/40%for
Marketing)/(Policy ***Ownership*** Resides with ***Producer***)." [1994 Memorandum (emphasis
added).]

In June 2019, when Lori Lock complained that Norick "has had no involvement in [the Summit account] since Con left" in the context of a conversation about a $73,000 commission payment to Norick, Mr. Boberg explained that there was "[n]othing to discuss. It's a longstanding agreement with Jim/Bill and Norm. like it or no, we have to live with it." [Markowitz Decl., Ex. J.]

Again, in December 2020, Mr. Johnson asked whether Mr. Boberg approved a 50% commission payment to Norick for November totaling more than $25,000. Mr. Boberg reached out to Mr. Hays and Mr. Mershon and stated, "I recognize the agreement and loyalty," but reiterated his concerns about the changed circumstances "since the original agreement." He suggested that he communicate with Mr. Hagen and propose lowering the payments for the following year, but discontinuing payments after that. Mr. Boberg closed, stating, "To pay them in excess of $200K on an account they haven't touched in 12+ years is a lot!!!" [Markowitz Decl., Ex. L.] Even into June of 2021, in emails to Mr. Boberg concerning Norick commission payments, Mr. Johnson was still referring to the "amount owed for Summit," even though Mr. Boberg stated that "[w]e'll be coming to an end on that but have not had a chance to talk with norm just yet." [Markowitz Decl., Ex. N.] In sum, up until a few months before Defendant ceased making commission payments to Norick, its own internal conversations reveal an understanding that it had an obligation to pay Norick an agreed-upon percentage of Summit revenue despite the fact that Norick performed no work on the Summit account.

These communications and the other actions of the parties after the contract was formed remove all ambiguity and obviate the need for a jury to decide what the parties

intended "sell" and "sales" to mean in the agreement. Even viewed in the light most favorable to HCI, the evidence demonstrates that when there was a shared account originated by one party and marketed/serviced by the other, the parties' mutual understanding was that the one who originated the business would receive 60% of the revenue, corresponding to that party having "sold" the account. That is ultimately what is set forth in the agreement's "Split 60% for Sales/40% for Marketing" revenue sharing schedule, which was later modified by the parties with respect to the Summit account, and that is what is conclusively reflected in the party's post-contract behavior. No other reasonable construction could follow from the Defendant's reliable payment of commissions equal to the agreed-upon percentages year after year or its repeated acknowledgment that the parties had a pre-existing agreement to pay Norick such percentage commissions on the Summit account, even in the face of internal objections.

Against this conclusive evidence of the parties' objective post-contract conduct evincing the mutual understanding of the contract's terms, HCI argues that Mr. Mershon and Mr. Hays provided testimony in their depositions raising an issue for trial concerning the proper interpretation of the contract. Mr. Hays testified that after the origination of an account, "the sell concept just doesn't go away. It's day-to-day contact. And if [Norick] had contact and controlled the relationship, they got paid. If they didn't, they shouldn't." Further, he stated that to "sell" means "ongoing relationships socially . . . talking to the customer, making sure the customer is happy with the services provided," and maintaining the relationship. [Def.'s Opp'n 4; Hays Dep. 21:4–8, 25:5–15.] Similarly, HCI relies on Mr. Mershon's testimony that the originator and seller of an account "are

not necessarily one in the same" because "a seller is the one who helps interface with the marketers and helps us resolve issues with the client . . . [t]hey are a relationship person." [Def.'s Opp'n 4; Mershon Dep. 24:1–4, 25:8–18.]

Ultimately, even viewed in the light most favorable to HCI, the Court finds that this deposition testimony would not allow a reasonable juror to conclude that the parties intended for the "sell" term in the contract to require an ongoing relationship between the originator of the shared account and the client. Mr. Hays and Mr. Mershon pointedly *did not testify* that this ongoing-relationship construction was part of the "parties' conversations and conduct during [any] preliminary negotiations" which is one type of extrinsic evidence that can be "properly admitted by the trial court to aid in the construction of [an ambiguous] contract." *ICC Leasing Corp. v. Midwestern Machinery Co.*, 257 N.W.2d 551, 554 (Minn. 1977) (discussing the propriety of considering pre-contract negotiations to determine the parties' intent in resolving ambiguity); *cf. H.J. Kramer Plumbing & Heating, Inc. v. Scharmer*, 386 N.W.2d 742, 747 (Minn. Ct. App. 1986) (discussing disputed trial testimony about whether the defendant communicated a quote to build a lift station to the plaintiff "before the contract was signed" in assessing the meaning of ambiguous contract language). In fact, they did not even suggest that this was the understanding that they had about what it meant to "sell" a shared account at the time they signed the 1994 Memorandum. And this understanding did not seem to be shared when the agreement was modified to a 50/50 split, though that occurred long after anyone from Norick did any work on the Summit account. Consequently, this aspect of their testimony says little about "what was in the minds of the parties when the contract

was made and the actual situation that then existed to the knowledge of both parties."
*Wick v. Murphy*, 54 N.W.2d 805, 808–09 (Minn. 1952) (considering evidence of
discussions between the parties at the time of contracting to "aid the court in resolving
the ambiguity" in the contract); *Process AM., Inc. v. Cynergy Holdings, LLC*, No. 12 Civ
772 (BMC), 2014 WL 3844626, at *4 (E.D.N.Y. Apr. 30, 2014) (indicating that if the
court were to consider extrinsic evidence, then "the post-hoc and often self-serving
testimony of the parties' witnesses as to their subjective interpretations of the contract is
of little value to the Court's present analysis of the Agreement"). And as discussed above,
"the parties' own subsequent conduct," which is "the most probative evidence," *Loftness*,
818 F.3d at 362, would not permit a reasonable jury to conclude that the parties intended
"sell" to require the maintenance of an ongoing relationship.

Accordingly, the Court finds that although the meaning of the terms "sell" and
"sales" in the 1994 Memorandum are ambiguous, the undisputed evidence of the parties'
post-contract conduct conclusively establishes that they intended originator of a shared
account, such as the Summit account, to receive 60% of the revenue generated even if the
originator did no additional day-to-day work on the shared account. A jury trial is,
therefore, unnecessary to resolve the ambiguity, and Norick has shown, as a matter of
law, that it was the seller on the Summit account.

### D. Breach

The parties next dispute whether Norick has shown that there is no genuine issue
of material fact with respect to the element of breach. HCI does not dispute that it
continues to receive payments in connection with work that it performs for Summit. Nor

24

does HCI dispute that in September 2021, it ceased paying Norick 50% commissions on the revenues HCI received from the Summit account. Instead, HCI argues that it did not breach the parties' agreement because (1) the 1994 Memorandum was a contract of indefinite duration that was terminable at will, and (2) HCI gave reasonable notice to Norick that it was terminating the revenue sharing on the Summit account during the summer of 2021 and again in writing as of October 11, 2021. In response, Norick contends that HCI was not entitled to terminate the contract at will because (1) Norick fully performed, (2) the contract is not indefinite in duration, and (3) the 1994 Memorandum has an implied duration that is the life of the Summit account. Based on the record before it, as a matter of law, the Court finds that the 1994 Memorandum is not indefinite in duration, and HCI was not entitled to unilaterally terminate the contract and its obligation to continue sharing revenues on the Summit account.

Under Minnesota law, the duration of a contract may be stated expressly, or it may be implied. *Legred v. Smeal Pork Co.*, 2002 WL 31819222, at *1 (Minn. Ct. App. Dec. 17, 2002) (citing *Benson Coop. Creamery Ass'n v. First Dist. Ass'n*, 151 N.W.2d 422, 426 (Minn. 1967)). If the duration of the contract is indefinite, either party is entitled to terminate the contract at will by giving reasonable notice to the other. *Glacial Plains Coop. v. Chippewa Valley Ethanol Co.*, 912 N.W.2d 233, 237 (Minn. 2018); *Benson Coop.*, 151 N.W.2d at 426 (citing 17 Am. Jur. (2d) Contracts § 486). "Minnesota law makes clear that a contract is not indefinite when a party's performance is conditioned on conduct within that party's control." *Lamoureux v. MPSC, Inc.*, 849 F.3d 737, 741 (8th Cir. 2017); *Minn. Deli Provisions, Inc. v. Boar's Head Provisions Co.*, 606 F.3d 544, 549

(8th Cir. 2010) ("Minnesota law does not, however, permit unilateral termination at will in cases where the contract provides that it will continue 'so long as' one party performs satisfactorily.").

Here, the Court finds that the 1994 Memorandum is not indefinite, and there is no genuine dispute that the 1994 Memorandum contains an implied durational term concerning revenue sharing on shared accounts, namely for as long as the shared account continues. It is true that the 1994 Memorandum contains no express statement concerning how long revenue sharing will continue for any shared account. They did not, for example, indicate that the 60-40% revenue-sharing arrangement on shared accounts would last for only five years or any other specified period. But this does not mean that the duration of the agreement is indefinite and, therefore, terminable at will by HCI.

Given the silence of the contract as to the duration of revenue-sharing obligations on shared accounts, the Court turns to the most probative evidence of the parties' intent—their actions after they formed the agreement. *Loftness*, 818 F.3d at 362. As discussed above, that conduct includes Defendant's repeated acknowledgment of its obligation to continue paying Norick a share of the Summit revenue many years after Norick originated the account. The Defendant's principals also rebuffed attempts within the company to terminate the revenue-sharing agreement on the Summit account unilaterally. They did so in the face of changed circumstances, including a dramatic expansion of the Summit business. The post-contract conduct demonstrates that the parties intended for Defendant to continue sharing revenue with Norick on the Summit account for as long as Defendant continued to collect that revenue.

HCI's own deposition testimony reveals that the parties' conduct regarding Summit was consistent with their general intent to continue sharing revenues on shared accounts as long as the account remained active. HCI could not identify an instance where either side ceased revenue sharing while the client continued as a shared account. [Hays Dep. 89:23–90:2; Mershon Dep. 76:1–84:7.] There were only two scenarios identified where revenue sharing was discontinued on shared accounts. One occurred when revenue ceased coming in altogether because the customer took its business elsewhere. The other was when shared accounts ceased being shared accounts at all. In the latter scenario, although one party had been receiving commissions as the "seller" while the other marketed/serviced the account, the marketing and servicing were transferred to the "seller" so that all revenue went to that party alone. [Hays Dep. 83:23–90:2; Mershon Dep. 76:1–84:7.] The Defendant was also aware that a client could either fire its broker at any time or continue working with the marketer/servicer for many years and that the amount of work required could change dramatically from year to year. [Hays Dep. 42:12–23; Mershon Dep. 19:6–22.]

This record would allow a reasonable jury to reach only one conclusion—that the 1994 Memorandum contains an implied term of duration for shared accounts whereby the marketer will continue to share revenues with the seller for as long as the marketer continues to service the shared account. The existence of that implied durational term in the 1994 Memorandum makes this case similar to others where courts have found contracts were not indefinite in duration and, therefore, could not be terminated by one party at will. *See, e.g., Legred*, 2002 WL 31819222, at *2 (finding that a contract was not

indefinite because it "implicitly included a durational term: as long as Legred's F-1 gilts were in the Smeal Pork herd" Smeal Pork would be required to share revenues with Legred per the parties' contract).

The Eighth Circuit's decision in *Lamoureux* is instructive, though the contract at issue there discussed events of termination. The defendant, MPSC, was a meat-processing facility that needed to secure startup capital, and it entered an agreement with the plaintiff, Mr. Lamoureux, in which he provided funds in exchange for royalty payments to be made "as long as th[e] agreement remains in effect." 849 F.3d at 739. The contract did not include a specific termination date, but provided that the agreement would terminate if MPSC dissolved, was bankrupt, or went into receivership; if the legal holders of the agreement passed away with no survivors; or if the parties mutually agreed to termination. *Id.* Twenty-five years after the agreement was entered and MPSC had been making royalty payments to Lamoureux, "MPSC determined that because the agreement did not contain a precise termination date, MPSC had the right to terminate the agreement at will after providing reasonable notice." *Id.* Mr. Lamoureux had passed away, and MPSC notified his surviving spouse of its decision to terminate the contract and stopped making payments. *Id.* Applying Minnesota law, the Eighth Circuit rejected the argument that the contract was indefinite and terminable at will. *Id.* at 741–42. The *Lamoureux* court reasoned that MPSC's performance was conditioned on conduct within its control. *Id.* at 742 ("The choice to process meat, which triggers the contractual obligation to pay, rests entirely at MPSC's discretion."). The same is true here for HCI— the choice to perform services for Summit, which triggers the contractual obligation to

pay a commission to Norick as the "seller," rests entirely in HCI's discretion. Stated another way, HCI could choose to stop working for Summit if it believes the work is not profitable enough because it has to pay Norick a commission it views as too pricey. But it cannot simply terminate the contract.

HCI argues that its performance is not, in fact, within its control because Summit could decide to terminate the relationship with HCI at any time for any reason. This argument misses the mark. None of the cases HCI relies on suggests that a third party's ability to terminate a relationship with one of the contracting parties renders an agreement's term of duration indefinite. Here, the fact that Summit could decide to stop doing business with HCI does not change the fact that HCI's performance remains dependent on conduct within its own control. HCI retains the discretion to cease making 50% payments to Norick per the parties' agreement because it can choose to stop performing work for Summit. However, having agreed to share revenues on a shared account with the account's seller, HCI cannot unilaterally decide that it should now receive all the benefits of the relationship with Summit without having to fulfill its obligations to share revenues with Norick.

HCI suggests that the 1994 Memorandum should be deemed indefinite and terminable at will based on the decision in *Waterford Township v. City of Northfield*, No. A19-0234, 2019 WL 3774615 (Minn. Ct. App. Aug. 12, 2019). But *Waterford* does not compel such a conclusion. The *Waterford* court addressed whether a tax-reimbursement agreement between a township and a city for a parcel of township land that the city annexed was perpetual in duration. *Id.*, 2019 WL 3774615, at *2–4. The court found that

the agreement was not perpetual, and the city properly terminated the indefinite agreement. *Id.* But the *Waterford* court did not address the issues that are squarely presented by the facts of this case. Nowhere does the *Waterford* court confront the issue of whether a contract's duration is indefinite when the agreement contains an implied durational term, as this Court has found is implied in the 1994 Memorandum. Nor did *Waterford* involve analysis of the issue of indefiniteness when a party's performance is conditioned on conduct within that party's control.

Finally, the Court notes that in its briefing discussing the relevant factual record, HCI suggests that "Norick expressed its consent to end commission-sharing in 2021," referencing an October 2021 email exchange between Mr. Hagen and Mr. Boberg. [Dkt. 57 at 7.] However, HCI does not argue that these communications are material to the issue of whether the 1994 Memorandum was indefinite in duration and cites no authority that suggests that it is.

To the extent HCI contends that Norick cannot prevail on its motion for summary judgment because it agreed to the termination of the revenue-sharing agreement, the Court disagrees. The parties' communications reveal that in the summer of 2021, at least Mr. Boberg and Mr. Hagen, and possibly others, met over lunch and discussed HCI's desire to stop making payments to Norick on the Summit account. HCI wanted to cease paying Norick effective September 15, 2021. Mr. Boberg proposed that date because it would coincide with a private equity entity's acquisition of Summit. And although Summit's new parent company wanted to move the Summit business away from HCI to a different firm, Summit convinced the parent company to keep HCI on board based on

their long-term relationships with HCI's personnel. [Digre Decl., Ex. 1 at 1–2, Dkt. 58-1.] A few months later, on October 10, 2021, Mr. Hagen wrote to Mr. Boberg offering to resolve a dispute over commissions on a different shared account as well as to propose a settlement on the Summit account. With respect to Summit, Mr. Hagen suggested that Norick should receive 50% of Summit revenues through the end of 2021. [*Id.*, Ex. 1 at 3 ("Again, I would settle for this year being the last payment. If we could agree on the above, you would be rid of us forever.").] Mr. Boberg wrote back the next day saying that he would "work to finalize a deal that makes sense for both of us" and repeated his intention to use the date of the Summit private equity sale as the final date for any shared commission. [*Id.*] Under Minnesota law, acceptance of an offer must be unequivocal and comply exactly with the requirements of the offer. *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008) ("Minnesota follows the mirror image rule, which requires that an acceptance be coextensive with the offer and may not introduce additional terms or conditions.") (quotations omitted). Mr. Boberg's response to Mr. Hagen's settlement proposal did nothing of the sort, so no agreement to terminate the revenue-sharing arrangement on Summit was ever reached. Indeed, given the parties' long-standing relationship, had Mr. Boberg in fact finalized such an agreement, it is very likely this litigation would never have begun.

### E.  Conclusion

Norick has shown that there is no genuine dispute of material fact that a contract was formed requiring HCI to pay 50% of all Summit account revenues to Norick; Norick fully performed its obligations under the agreement and was entitled to performance by

HCI; and HCI breached the agreement by unilaterally terminating the agreement and refusing to pay Norick the 50% commission payments Norick is owed. As a result, Norick is entitled to summary judgment on its breach-of-contract and declaratory-judgment claims.

Although Norick asks the Court to order specific performance of the 1994 Memorandum, the Court declines to determine the proper remedy at this time. If Defendant has continued earning revenues from September 2021, when it stopped paying commissions to Norick, through the date of this Order, Norick is entitled to backward-looking damages that can easily be calculated. Moreover, the declaratory-judgment remedy Norick requested in its Second Amended Complaint may, as a practical matter, be indistinguishable from the order of specific performance it requested in its motion.[6] In any event, as set forth below, the Court finds that the parties should be given an opportunity to discuss their proposals for how to most efficiently resolve the remedies phase of the litigation, including whether any further litigation is required, and the specifics of any judgment to be entered in Norick's favor.

---

[6] *Compare* Second Am. Compl. at 10 (stating that "the Court should declare that the Agreement is valid and enforceable and that Defendant is obligated to remit commissions to Norick under the Summit Agreement and the 1994 Agreement for as long as Summit remains a client"), Dkt. 31, *with* Pl.'s Mem. at 25 (requesting an order requiring "Defendant to pay Norick 50% of all revenue on the Summit Account, from September 2021 . . . for as long as Summit remains a client of Defendant"), Dkt. 49.

### III.    Order

Based on the discussion above, IT IS HEREBY ORDERED THAT Plaintiff's

Motion for Summary Judgment [Dkt. 47] is GRANTED IN PART and DENIED IN

PART. The parties are directed to meet and confer within 14 days of the date of this

Order to discuss proposals for conducting additional proceedings in this case including

resolution of any disputes concerning damages or other remedies. The Court encourages

the parties to continue to pursue reasonable efforts to resolve any remaining disputes

without the need for further intervention by the Court. No later than 30 days after the date

of this Order, the parties shall provide a joint update to the Court on the status of their

discussions including any proposals for additional proceedings.

Date: November 14, 2023

        *s/Katherine Menendez*
        Katherine Menendez
        United States District Judge