UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Norick, Inc.                                         No. 22-cv-1648 (KMM/JFD)

        Plaintiff,

v.
                                                              **ORDER**
Hays Companies Inc.,

        Defendant.

---

This matter is before the Court to determine the proper remedies in this matter. Def.'s Suppl. Mem. (Doc. 84); Pl.'s Opp'n (Doc. 86); Def.'s Reply (Doc. 89). Based on the parties' briefing and oral argument, and on the Court's familiarity with all the proceedings in this matter, the Court issues the following Order.

## BACKGROUND SUMMARY[1]

Plaintiff Norick, Inc. ("Norick") brought this action against Defendant Hays Companies Inc. ("HCI") for breach of contract. Both Norick and HCI are insurance brokerage firms that represent business clients in obtaining insurance coverage. Norick and HCI receive commissions on insurance that their clients elect to purchase. HCI's predecessor-in-interest and Norick entered into an agreement in 1994 that governs how the parties would divide commissions on shared accounts. The division of revenue for shared accounts depends on which company "sold" (i.e., originated) the account and which

---

[1] In the Court's summary judgment Order (Doc. 77), the Court discussed the relevant factual background of this case in detail and will not repeat it in detail in this Order. The Court provides the following summary of the factual and procedural history of this case for context.

company "marketed" (i.e., serviced) the account. The originator of a shared account received 60 percent of the revenue obtained while the marketer or servicer of a shared account received the remaining 40 percent.

In 2003, Norick originated/sold an account for Summit Fire Protection Company ("Summit"), and afterward, HCI performed all the servicing/marketing for the Summit Account. True to the terms of the 1994 Agreement, HCI remitted 60 percent of the revenue it received from Summit to Norick for approximately seven years, although its invovlemnt with the account had ceased. In 2010, because the Summit Account required HCI to do considerably more work than originally anticipated due to the growth of the business, the parties agreed to modify the terms of the 1994 Agreement. They agreed that the Summit revenue should be shared evenly between them—50 percent each. And for the next 11 years, HCI sent Norick half of the revenue it received from Summit.

Eventually, however, HCI tired of this arrangement, and on September 15, 2021, it determined that it was no longer required to share revenue on the Summit Account. HCI stopped paying Norick its 50 percent share and has not made any such payments since, despite continuing to receive revenue from Summit.

On November 14, 2023, the Court issued an Order granting Norick's motion for summary judgment and denying HCI's cross-motion. The Court found that there is no genuine dispute that: (1) the parties formed an enforceable agreement, (2) the 1994 Agreement required HCI to pay Norick the agreed-upon percentage of revenue HCI received from Summit, even though Norick had performed no work on that account since originating the business, (3) the parties modified the schedule for shared revenues on the

Summit Account so that each would receive 50 percent, (4) HCI was not entitled to unilaterally terminate the 1994 Agreement, and (5) HCI breached the agreement when it stopped paying Summit revenues to Norick.

The Court did not, however, grant Norick's motion to the extent it requested an order requiring specific performance, though it noted that Norick had requested a declaratory judgment in its pleadings that would provide it essentially the same relief. Nor did the Court direct entry of judgment at that time because the record before the Court did not clearly establish whether there was any issue left for trial with regard to damages. The Court instructed the parties to continue their efforts to resolve the dispute without further litigation. In addition, the Court required the parties to advise whether they believed any additional proceedings were necessary and provide proposals for how those proceedings should be conducted.

In its post-summary-judgment letter, Norick asserted that it was entitled to entry of a money judgment. HCI, on the other hand, argued that Norick was not entitled to any meaningful remedy. HCI raised several arguments in support of its position regarding damages, and the Court concluded that it could not resolve the parties' dispute without further briefing. Accordingly, the Court issued a Briefing Order establishing deadlines for the parties to submit their memoranda on the remaining remedies issues. The parties completed that briefing in May 2024 and on July 11, 2024, the Court heard oral argument on the outstanding issues during a remote hearing.

There are four issues before the Court. First, HCI argues that Minnesota law prohibits it from paying any portion of the Summit commissions to Norick because Norick

is not properly licensed. Second, HCI argues that because it has done all of the work on the Summit Account, it is entitled to an offset of any revenues that would be owed to Norick under the 1994 Agreement to account for HCI's increased expenses. HCI suggests that there are disputed issues regarding such an offset that should be decided by a jury. Third, the parties disagree about how prejudgment interest should be calculated in this matter. And finally, the parties ask the Court to resolve a dispute about whether the interests of Norick's principals in the 1994 Agreement are assignable to their heirs.

## I.    Minn. Stat. § 60K.48

First, HCI argues that Minnesota law prohibits all payments of commissions to Norick because Norick's principals, Richard Glasgow[2] and Norm Hagen, are no longer licensed insurance providers. HCI contends that the plain language of Minn. Stat. § 60K.48 prohibits these payments.

Section 60K.48 provides:

> **Subdivision 1. Payment prohibited.** An insurance company or insurance producer shall not pay a commission, service fee, brokerage, or other valuable consideration to a person for selling, soliciting, or negotiating insurance in this state if that person is required to be licensed under sections 60K.30 to 60K.56 and is not so licensed.

> **Subd. 2. Acceptance prohibited.** A person shall not accept a commission, service fee, brokerage, or other valuable consideration for selling, soliciting, or negotiating insurance in this state if that person is required to be licensed under sections 60K.30 to 60K.56 and is not so licensed.

---

[2] Sadly, while these matters were pending before the Court, Mr. Glasgow passed away. Pl.'s Letter (Aug. 29, 2024) (Doc. 99).

**Subd. 3. Exceptions.** (a) Renewal or other deferred commissions may be paid to a person for selling, soliciting, or negotiating insurance in this state if the person was required to be licensed under sections 60K.30 to 60K.56 at the time of the sale, solicitation, or negotiation and was so licensed at that time.

(b) An insurer or insurance producer may pay or assign commissions, service fees, brokerages, or other valuable consideration to an insurance agency or to persons who do not sell, solicit, or negotiate insurance in this state, unless the payment would constitute an illegal rebate or otherwise violate section 72A.20, subdivision 10. A duly licensed producer may pay commissions or assign or direct that commissions be paid to a partnership of which the producer is a member, employee, or agent, or to a corporation of which the agent is an officer, employee, or agent.

Minn. Stat. § 60K.48.

According to HCI, neither Mr. Hagen nor Mr. Glasgow are currently licensed insurance providers within the meaning of the statute. Their licenses lapsed. Haws Decl., Exs. 1–2. Norick's license expired in October 2022, and was only later renewed in April 2024. *Id.*, Exs. 3–4. Therefore, HCI argues that under Section 60K.48, subdivision 1, HCI cannot legally pay any commission, service fee, brokerage, or other valuable consideration to Norick for selling, soliciting, or negotiating the Summit Account. HCI also argues that the payments Norick seeks to recover are not "renewal" payments under subdivision 3 of the statute because, after Norick originated the Summit Account in 2003, on two previous occasions, private equity firms acquired Summit, and HCI had to sell Summit policies anew. Finally, HCI contends that payments to Norick under the 1994 Agreement do not qualify as "deferred" commissions under subdivision 3 of the statute because there is no evidence that the payments Norick seeks from HCI have been intentionally delayed.

Norick argues that Section 60K.48 does not prohibit HCI from remitting payments to Norick as required by the 1994 Agreement for four reasons. First, although Mr. Hagen's and Mr. Glasgow's licenses lapsed, another Norick employee, Linda Glasgow, has obtained a license, and her licensure renders HCI's entire argument moot. Second, Norick contends that HCI waived this argument by failing to raise it as an affirmative defense. Norick argues that HCI's position regarding the applicability of Section 60K.48 is essentially a claim that it would be illegal for HCI to make payments to Norick. Because illegality is an affirmative defense to a breach-of-contract claim that a defendant is entitled to plead and prove, and HCI neither raised such a defense in their answer, nor amended their answer to include it. Third, Norick contends that HCI also waived this argument by failing to raise it in its summary judgment briefing. And fourth, Norick argues that even if the company is not now licensed or loses its license in the future, Section 60K.48 doesn't prohibit HCI's payments of a percentage of the Summit revenue to Norick because the exceptions in subdivisions 3(a) and 3(b) of the statute apply under these circumstances.

The Court concludes that HCI has not demonstrated that Section 60K.48 precludes a damages award to Norick. As explained below, HCI's argument is an affirmative defense that HCI failed to raise in a timely manner and, therefore, the defense is waived. In addition, the Court is not persuaded that the statute clearly prohibits payments from HCI to Norick under the circumstances of this case.

**A. Waiver**

First, the Court finds that HCI forfeited[3] its defense that the commission payments Norick claims entitlement to received are unlawful under Minn. Stat. § 60K.48. HCI suggests that their answer to the Second Amended Complaint adequately preserved this defense, but having reviewed all the pleadings, the Court disagrees. That alone would not be enough to find waiver under these circumstances because the lapse in licensure on which HCI's newly articulated defense is based did not occur until after HCI served its final responsive pleading. However, even after the licenses lapsed in late 2022, HCI did not conduct any investigation into this issue, never sought leave to amend its affirmative defenses, and did not raise the issue in it own motion for summary judgment or its opposition to Norick's motion. Instead, it waited until after the Court held a hearing on the motions for summary judgment to conduct a straightforward internet inquiry, and having discovered the lapse in licensure, came up with a new argument that it believed could help its cause. Under these circumstances, HCI's statutory defense to payment was not preserved.

---

[3] Cases within the Eighth Circuit addressing failure to timely present an affirmative defense appear to use the terms "forfeit" and "waiver" interchangeably. *Compare Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 498 (8th Cir. 2010) ("forfeited"), *with Clark v. Martinez*, 295 F.3d 809, 815 (8th Cir. 2002) ("waives"). There is a distinction between "forfeited" defenses—where a party fails to plead and therefore preserve an issue—and defenses that are "waived"—where a party "knowingly and intelligently relinquishe[s]" the defense. *Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012). The issues in this case fit more neatly into the forfeiture camp, but because the relevant cases sometimes use waiver when forfeiture may be the more apt term, this Court uses the terms interchangeably as well.

### *Legal Standards – Waiver of Affirmative Defenses*

Federal Rule of Civil Procedure 8(c) requires a party to assert any affirmative defense in its responsive pleading. Fed. R. Civ. P. 8(c)(a) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense. . . ."). "Illegality" is one of the affirmative defenses explicitly listed in the Rule. *Id.* In general, a defense that "merely negates an element of the plaintiff's prima facie case is not truly an affirmative defense and need not be pleaded." *Ivers v. CMFG Life Ins. Co.*, No. 15-cv-1577 (WMW/BRT), 2017 WL 8315859, at *9 n.13 (D. Minn. June 29, 2017) (finding a party did not waive a lack-of-capacity defense to a breach-of-contract claim because "contract formation is an essential element" of such a claim) (cleaned up). "In a diversity case, the legal and factual sufficiency of an affirmative defense is examined with reference to state law." *First Union Nat'l Bank v. Pictet Overseas Tr. Corp., Ltd.*, 477 F.3d 616, 621–22 (8th Cir. 2007) (quoting *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991)).[4]

A defendant's compliance with Rule 8(c) allows "the opposing party notice and a chance to 'develop evidence and offer arguments to controvert the defense.'" *Geelan v. Mark Travel, Inc.*, No. 03-cv-6322 (DSD/JSM), 2006 WL 3610804, at *5 (D. Minn. Dec. 11, 2006) (quoting *Wolf v. Reliance Std. Life Ins. Co.,* 71 F.3d 444, 449 (1st Cir. 1995)). "A party 'generally waives an affirmative defense' if it fails to assert that defense in the responsive pleading." *Id.* (quoting *Clark v. Martinez,* 295 F.3d 809, 815 (8th Cir. 2002)). In addition, where a party asserts an affirmative defense in its pleadings, but fails to assert

---

[4] Like Federal Rule of Civil Procedure 8(c), Minnesota Rule of Civil Procedure 8.03 lists "illegality" among the affirmative defenses that must be set forth in a responsive pleading.

the application of the defense as a barrier to an opponent's motion for summary judgment, he waives it. *Picht v. Jon R. Hawks, Ltd.*, 236 F.3d 446, 451 (8th Cir. 2001) (finding that defendant waived an affirmative defense pled in it is answer where the defendant "did not . . . press [the] defense in response to the [plaintiffs'] motion for partial summary judgment or in its memorandum in support of its own motion for summary judgment").

In determining whether a defense is forfeited, the Eighth Circuit has "eschewed a literal interpretation of [Rule 8] that places form over substance." *First Union Nat'l Bank*, 477 F.3d at 622. Instead, "when an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, technical failure to comply with Rule 8(c) is not fatal." *Id.* (cleaned up). "Where the circumstances merit it, [the Eighth Circuit] ha[s] accepted and favorably cited affirmative defenses first raised at various stages of litigation." *Id.* at 622 n.5. If there is no unfair surprise, courts may treat an untimely assertion of a defense as constructively amending the pleadings. *See id.* at 623 (treating a party's notice to an opposing party, before the opponent moved for summary judgment, that the party intended to use a statutory provision as a defense to a breach-of-fiduciary-duty as constructively amending its pleadings).

### *Analysis*

As an initial matter, the Court finds that HCI's Section 60K.48 defense is an affirmative defense, not merely a defense that negates an element of Norick's breach-of-contract claim. The gravamen of HCI's argument is that even if Norick established all the elements of its breach-of-contract claim, the payments HCI is required to make under the contract are illegal because Section 60K.48 prohibits them. Such an illegality-of-contract

9

argument is an affirmative defense. *See Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893, 909 (8th Cir. 2010) (characterizing illegality of contract as an affirmative defense and noting that it can be waived by failing to plead it) (citing *Coury v. Prot*, 85 F.3d 244, 255 (5th Cir. 1996)); *see also*, 1 Minn. Prac., Civil Rules Annotated § 8:8 Affirmative defenses (6th ed.) ("Any defense which would bar the claimant's recovery and which is not part of the claimant's claim is an affirmative defense, and should be pleaded accordingly."). This is consistent with Minnesota law. *See Whitbeck v. Webb*, No. C5-94-2627, 1995 WL 536430, at *4 (Minn. Ct. App. Sept. 12, 1995) ("We agree with the trial court that [defendant] waived th[e] defense [that the contract was unenforceable as against public policy] by failing to assert the affirmative defense in its answer.") (citing *St. Cloud Aviation, Inc. v. Pulos*, 375 N.W.2d 543, 545 (Minn. Ct. App. 1985)); *see also Andrus v. Dyckman Hotel Co.*, 148 N.W. 566, 567 (Minn. 1914) ("[W]here illegality of contract is relied on, but does not appear from the complaint, a state of facts must be pleaded in the answer showing that no recovery can be had.") (citing *Woodbridge v. Sellwood*, 67 N.W. 799, 799–800 (Minn. 1896)).

Next, although HCI argues that it preserved this statutory defense through broad language in its responsive pleadings, the Court disagrees. HCI never included Section 60K.48 among the affirmative defenses identified in response to Norick's original Complaint, the First Amended Complaint, or the Second Amended Complaint. HCI's responsive pleadings did not generally state that Norick's claim to be owed commission

payments was prohibited by a state statute, nor that such payments had been rendered illegal.[5]

Specifically, HCI argues that it preserved this affirmative defense in its Answer to the Second Amended Complaint because it asserted that it does not owe a legal duty to Norick to "make payments to [Norick] as alleged in the Complaint." Pl.'s Reply 3 (citing Ans to Second Am. Compl. 11 (Doc. 34)). But HCI cites no authority to support its argument that such broad and vague language was sufficient to preserve its statutory defense under Rule 8(c). This no-legal-duty affirmative defense did nothing to put Norick on notice that HCI intended to argue that the breach-of-contract claim failed because paying the commissions would violate a state licensure law. A reasonable party in Norick's position would not have understood this vague allegation to be invoking or even hinting at a statutory prohibition on payment. Accordingly, HCI did not preserve this as an affirmative defense in its responsive pleadings.

As noted, the Court's waiver analysis does not stop there because, at the time HCI filed its final responsive pleading, the relevant licenses had not yet lapsed, so the facts underlying that defense did not yet exist. Indeed, the record indicates that Mr. Hagen's licensure expired in December of 2022 and Norick's license expired in October of 2022.

---

[5] The Court acknowledges that Rule 8 requires a court to construe pleadings "so as to do justice." Fed. R. Civ. P. 8(e). Although HCI does not rely on it, the Court finds that HCI's attempt in its Answer to the Second Amended Complaint to incorporate every specific defense listed in Rule 8 of the Federal Rules of Civil Procedure did not suffice to put Norick on notice that its licensure was at issue. *See* Ans. to Second Am. Compl., Affirmative Defenses ¶ 22 (Doc. 34). Such generalized assertions of all defenses do not actually inform plaintiffs what defenses they should be prepared to oppose.

HCI served its Answer to the Second Amended Complaint on October 28, 2022. The Court may, in an appropriate case, deem the pleadings to have been amended, but the Court declines to do so here for the following reasons.

After the licenses lapsed, HCI did not diligently attempt to make the licensure issue a part of the litigation. Both Norick's and Mr. Hagen's license lapsed several months before fact discovery closed on April 3, 2023, and even longer before the deadline for filing dispositive motions on June 25, 2023. Norick filed its motion for summary judgment in April 2023, and HCI's motion followed in May 2023. But HCI did not raise its Section 60K.48 defense in the summary judgment briefing or at the July 11, 2023 summary judgment hearing.[6] Indeed, there is nothing before the Court suggesting that HCI even investigated the licensure issue until after the entire summary judgment record had been submitted.

To be clear, this is not a case where any claim of unfair surprise would be negated because the pleadings included an affirmative defense that alerted the plaintiff to the fact that the defendant intended to raise the issue that the Court now finds forfeit. *See Jacam Chem. Co. 2013, LLC v. Shepard*, 101 F.4th 954, 962–63 (8th Cir. 2024) (finding no unfair surprise where the pleadings asserted "lack of consideration" and not the distinct defense

---

[6] HCI suggests that it preserved this issue by arguing in the summary judgment briefing that "Plaintiff's damages were speculative, conjectural, and therefore not recoverable as a matter of law, and that specific performance is not an appropriate remedy." Pl.'s Reply 5. HCI makes no effort to explain how its summary judgment issues adequately preserved the argument that a Minnesota statute made payments that Norick sought to recover unlawful. Nor does HCI cite any authority to support the proposition that raising an issue about the uncertainty of any damages necessarily preserves an argument that the contract payments at issue are illegal.

of "failure of consideration" because the defendant adequately "flagged his intention to argue a consideration issue as an affirmative defense"). Nor is this a situation in which HCI, having failed to include the illegality defense explicitly in its pleadings, nevertheless informed Norick of its intent to use Section 60K.48 as a defense to Norick's contract claim before summary-judgment briefing was presented. *See First Union Nat'l Bank*, 477 F.3d at 623. Rather, this is a case where HCI could have raised the defense in its initial summary judgment briefing if it had conducted a diligent inquiry, but it did not.

HCI asserts that the Court should not find waiver because it only discovered a lapse in licensure when HCI was ordered to attend a settlement conference. Only then did HCI "investigate[] its ability to pay any sum" to Norick, and according to HCI, Norick "failed to disclose its lapse in licensure." Pl.'s Reply 4. But there are at least two problems with this argument. First, whether HCI was legally permitted to "pay any sum" to Norick has been an issue since the outset of the litigation. That is, after all, precisely what Norick was claiming HCI was required to do according to the parties' contract in its original Complaint and each iteration that followed. HCI provides no rationale for waiting until the prospect of a court-ordered settlement conference to investigate whether it has an illegality defense to that claim.

Second, HCI bears the burden of proof on its statutory affirmative defense, so it was HCI's obligation to develop the record on this issue. HCI cites no authority for the proposition that Norick had an affirmative duty to disclose information about the state of its licensure, especially where HCI had not placed Norick on notice that it would argue a

lapse in the relevant license would preclude Norick's prayer for relief.[7] And HCI concedes that it first investigated this licensure question after summary judgment motions were filed and heard. HCI certainly could have discovered the lapse by conducting the same belated unilateral investigation it ultimately engaged in at any time after December of 2022.[8] Indeed, HCI well knew that the Norick principals were older gentlemen who did little active work with Norick, which alone ought to have raised the question of their licensure. Simply put, Norick is not responsible for HCI's belated investigation of licensure and invocation of Section 60K.48.

For these reasons, the Court finds that HCI forfeited its illegality defense and allowing HCI to inject its statutory arguments into the litigation at this very late stage would constitute unfair surprise and be prejudicial to Norick. The merits of the liability issues in this case have been thoroughly litigated, and they were decided before HCI presented this argument. Norick devoted its resources and its efforts during the discovery phase of the case to establish the elements of its claims and counter the defenses that HCI placed at issue. There are plenty of ways to speculate about how Norick may have litigated this case

---

[7] HCI does not suggest that Norick was required to include this information in its initial Rule 26(a) disclosures or through supplementation. HCI argues that Norick failed to provide information about its licensure during depositions or in its other discovery responses, but it does not point to any question in a deposition or discovery request that required Norick or its personnel to say anything about whether their licenses were up to date. HCI's citations to Mr. Hagen's and Mr. Glasgow's depositions do not reflect that HCI ever asked them about whether they held active licenses.

[8] HCI asserts that "Norick alone is and was in possession of knowledge of its licensure status." Def.'s Reply 4 n.1. But the record demonstrates that all HCI had to do to discover whether Norick or its principals were licensed was to make an online inquiry for publicly available licensure information regarding the status of any license for Norick, Hagen, and Glasgow. Def.'s Suppl. Mem. 3 n.1.

differently had it known that HCI would argue that the payments required by the 1994 Agreement had been rendered illegal by Section 60K.48. But by the time HCI brought the issue to the table, Norick already devoted considerable resources to litigate the issues that HCI actually raised. It seems clear, at a minimum, that if HCI had presented the issue sooner, Norick would have had an opportunity to take discovery on the issues. With Norick having successfully proven the merits of its claims and demonstrating that HCI is contractually required to remit 50 percent of its commissions on the Summit Account since it stopped making payments on September 15, 2021, HCI now seeks to reopen the litigation on the issue of its obligation to make those very payments. Allowing this would turn the Scheduling Order into a meaningless piece of paper and undermine reasonable expectations of how a case ought to proceed. Norick fought hard in this litigation to establish HCI's liability, and it would be prejudicial to require it to now fend off another defense that HCI could have, but failed to, raise earlier.[9]

### B. No Clear Prohibition

Even had HCI not forfeited its defense based on Section 60K.48, HCI has not demonstrated that the statute expressly prohibits the payments at issue on the facts of this case. HCI cites no caselaw interpreting this statute in the manner that it advocates here.

---

[9] HCI argues that a finding that it forfeited its newly minted defense is inappropriate because the "summary judgment record is still being made" since the Court did not ultimately resolve the issue of damages or remedies in its prior summary-judgment decision. Def.'s Reply 3. But HCI's Section 60K.48 defense is an argument that it cannot be liable for the payments Norick claims it is contractually entitled to receive because making those payments is unlawful. That is not an issue regarding the proper calculation of damages for a breach-of-contract claim, but a claim of contract illegality that would defeat liability. The time to raise such issues is past, and nothing about the Court's previous orders invites litigation over whether the agreement is unlawful.

The statute prohibits an "insurance producer" from paying a "commission … or other valuable consideration to a person for selling, soliciting, or negotiating insurance in this state if that person is required to be licensed … and is not so licensed." Minn. Stat. § 60K.48, subd. 1. But HCI does not argue that either Norick or its principals were unlicensed when Norick sold, solicited, or negotiated the deal with Summit in 2003. Nothing in the language of Section 60K.48 plainly prohibits an insurance producer from making payments to a person that sold or solicited insurance if the person was licensed as required at the time the person made the sale or solicitation. Moreover, there is no dispute that Norick and its employee, Ms. Glasgow, are now licensed. HCI does not offer any persuasive interpretation of the relevant statutory language to preclude the payment of commissions to a person with an active license merely because there was a prior lapse in the licensure.

Finally, the Court finds that, at a minimum, the plain language of the exception in subdivision 3(a) allowing for payment of "deferred" commissions applies. Subdivision 3(a) provides that "deferred commissions may be paid to a person for selling, soliciting, or negotiating insurance in this state if the person was required to be licensed … at the time of the sale, solicitation, or negotiation and was so licensed at that time." Minn. Stat. § 60K.48, subd. 3(a). Again, there is nothing before the Court showing that "at the time of the sale" at issue in this case (2003), Norick was not licensed as required. The statute does not define what constitutes a "deferred" commission, but the ordinary meaning of "defer" is that a matter is postponed or put off until a later time. *See* Black's Law Dictionary (11th ed. 2019) ("[t]o postpone; delay until a later date"); *Merriam-Webster Unabridged*

*Dictionary*, "defer," https://unabridged.merriam-webster.com/unabridged/defer, accessed Oct. 9, 2024. Here, the commissions that Norick was entitled to receive were not paid to it at the time that Norick sold, solicited, or negotiated the agreement with Summit, but were arguably postponed until a later time when HCI received revenue from Summit and then remitted that revenue to Norick. HCI proposes that to constitute "deferred" payments, there would have to be an agreement, "formally or informally, for HCI to withhold, defer, or delay commission payments to Norick," Def.'s Suppl. Mem. at 17, but does not explain why this interpretation of "deferred" commissions is the better reading of the statutory language. For these reasons, even had HCI properly invoked it Section 60K.48 defense, the Court finds that HCI has failed to demonstrate that its interpretation of the statute is correct and precludes any recovery by Norick.

## II.    Offset for Increased Costs in Servicing

HCI argues that if the Court were to enter judgment against HCI, that judgment amount should be offset by the costs HCI has had to incur in servicing the Summit Account. HCI contends that language in the 1994 Agreement suggests that the parties contemplated an offset for costs performed. Further, HCI asserts that the modification of the agreement from a 60/40 split to a 50/50 split suggests that the parties agreed to an offset for HCI's costs. And finally, HCI argues that because equity claims remain in the case, specifically a promissory estoppel claim, HCI should be entitled to an equitable offset for the work it has been performed.

The Court rejects each of these arguments. First, HCI points to no language in the 1994 Agreement to support its contention that the parties' intended to allow the

marketer/servicer to offset the seller's share of revenue on shared accounts by the costs the serviver incurs in performing its marketing work. There is none. On this point, the contract language is plain and unambiguous: the seller of a shared account gets 60 percent and the marketer of a shared account gets 40 percent of the revenues collected. HCI cannot rewrite the contract it now wishes it had agreed to as a means of saving itself from the consequence of the bargain it no longer likes.[10]

Second, nothing about the parties' modification of the agreement from a 60/40 split to a 50/50 split indicates that the parties further agreed to allow the marketer of the Summit Account to reduce its contractual obligations by an amount commensurate with its increased costs. While it is certainly true that the record established the parties adjusted the terms of their agreement once to an even split that made it somewhat less onerous for HCI to continue abiding by the contract, there was no evidence in the summary-judgment record, and none that HCI refers to now that suggests the parties' modification included terms allowing HCI to offset its commission payments to Norick below the 50 percent it agreed to pay. And the record is abundantly clear—with no material facts in dispute—that the parties performed under the contract for years after the modification without applying any such offset.

---

[10] HCI suggests that the Court should hold a trial so that a jury can determine whether and to what extent the parties' intended to exclude new policies added to the Summit Account after Norick originated the business from the revenue-sharing arrangement set forth in the 1994 Agreement. The Court disagrees because the course of performance clearly demonstrates that there was no intent to exclude such new-policy revenues from the shared Summit Account revenue—until they stopped paying entirely, HCI and its predecessor made payments without excluding any additional revenues earned on new policies that became a part of the account after Norick's origination had already occurred.

Finally, HCI's reliance on an unadjudicated promissory-estoppel claim that Norick included in its pleadings is a nonstarter. As plaintiffs in litigation often do, Norick asserted the promissory-estoppel claim in the alternative to its breach-of-contract claim, essentially hedging against the possibility that the Court would find that the contract was not a valid and enforceable agreement. But Norick has prevailed on the merits of its breach-of-contract claim at summary judgment, and consequently, the promissory-estoppel claim in this case is now moot. The Court's summary judgment ruling was not based on estoppel or any other equitable considerations, but on the contract between the parties. To the extent HCI contends that it is entitled to equitable deductions from its contractual damages simply because the Complaint contained a claim based in equity, it has provided no authority that stands for such a proposition.

## III.    Prejudgment Interest

The parties' dispute over prejudgment interest comes down to a question of the date on which the Court should determine that prejudgment interest began to run.[11] In a diversity case such as this, prejudgment interest is governed by Minnesota law. *Iota Phi Lambda Sorority, Inc. v. Contenta Global Cap. Gr., LLC*, No. 19-cv-532 (SRN/DTS), 2019 WL 4687115, at *25 (D. Minn. Sept. 26, 2019). Under Minn. Stat. § 549.09, there is a flat 10 percent prejudgment interest rate where damages exceed $50,000.[12] *Id.* at *26 (citing Minn.

---

[11] Although HCI contends that any determination regarding prejudgment interest is not properly before the Court at this time and should await entry of judgment, with respect to the limited issue of the date when such interest starts to run, the Court disagrees.

[12] Here, although the Court still does not have before it the precise number that HCI owes to Norick for failing to pay half of the Summit revenue to Norick since September 15, 2021, there is no dispute that the amounts owed on the Summit Account exceed $50,000.

Stat. § 549.09, subd. 1(c)(2)). Prejudgment interest begins to run from either "the time of commencement of the action . . . or the time of a written notice of claim, whichever occurs first." *Id.* (quoting Minn. Stat. § 549.09, subd. 1(b)).

According to Norick, interest should begin to accrue on October 10, 2021 when Norick advised HCI that it should still receive 50 percent of the commission for Summit in response to HCI's efforts to extricate itself from the parties' revenue-sharing arrangement. According to Norick, this email was sufficient to put HCI on notice of a claim prior to filing suit. HCI contends that April 13, 2022 marks a more appropriate date for the onset of prejudgment interest. That was the date that Norick sent a letter to HCI articulating the scope of its claim. Kane Decl., Ex. 1 (Doc. 90). Norick informed HCI in that letter that it had a claim against HCI and demanded 50 percent of commissions on the Summit Account that HCI received after September 2021.

The Court finds that HCI has the better of this argument. The October 10, 2021 communication from Norick to HCI was not explicitly a demand for payment, and it did not put HCI on notice that failure to pay could cause Norick to seek relief from a court through litigation. By contrast, the April 13, 2022 letter contains an explicit demand and provides notice to HCI that Norick would be seeking relief. *See Flint Hills Res. LP v. Lovegreen Turbine Servs., Inc.*, No. 04-cv-4699 (JRT/FLN), 2008 WL 4527816, at *9 (D. Minn. Sept. 29, 2008) (citing Minnesota cases describing the notice required by the state's prejudgment interest statute as one involving "a demand for payment").

Accordingly, when the time comes to enter a money judgment in this case, prejudgment interest shall be calculated with a start date of April 13, 2022.

## IV.    Assignability of Rights

Finally, the parties ask the Court to resolve a dispute concerning whether Norick has the power to assign rights under the contract to the heirs of Mr. Hagen and Mr. Glasgow. Norick argues that its right to payment can be assigned, and HCI disagrees.

The Court understands why the parties want the Court to resolve this issue now. However, as the Court previewed at the hearing, this dispute is not properly before the Court. The parties to this dispute are Norick and HCI, and the agreement they are arguing about in this case is between those two corporations. In this case, they have litigated their disagreements concerning whether the 1994 Agreement is a valid and enforceable contract, whether HCI breached the agreement, and whether HCI could terminate the agreement at will. Hopefully, the parties will put something before the Court soon that will allow the Court to enter a judgment so that HCI can get on with its appeal. Neither Mr. Hagen nor Mr. Glasgow, nor their heirs are parties to this case. As far as the Court is aware, Norick is still an existing corporation, even if it exists in its current form only to receive payments from HCI pursuant to the 1994 Agreement.

For these reasons, the Court finds that it would be offering an advisory opinion to wade into a disagreement concerning assignability of rights that has not been the subject of this litigation.[13]

---

[13] The Court does not agree with Norick's assertion that because Mr. Glasgow has recently passed away, this issue of assignability is now ripe for adjudication as part of this suit.

## V.    Conclusion

Having resolved (and in one case, declined to resolve) the issues raised in the parties' briefing, that leaves on the table only how to bring this phase of the litigation to a close. During the hearing, the Court discussed with the parties the possibility that it would reach a result substantially the same as that which is reflected in this Order. Because the amount of any past-due contractual damages in this case is relatively easy to calculate, the parties appeared to agree with the Court that there was no reason to empanel a jury to do the math of dividing by 50 percent the total revenue that HCI has received from Summit since it ceased making payments to Norick. Consistent with the discussion the Court had with the parties on July 11, 2024, the Court now issues the following litigation management Order.

1.  Within 10 days of the date of this Order, HCI shall provide to Norick sufficient information to show a true accounting of the revenues received from Summit since HCI ceased making payments to Norick in September 2021.

2.  Within 30 days of the date of this Order, the parties shall have concluded a meet-and-confer process discussing how to bring this litigation to a close through the entry of a final and appealable judgment.[14]

3.  Within 30 days of the date of this Order, Norick shall notify the Court of the substance of the parties' discussions and inform the Court of the procedures the

---

[14] Regardless of HCI's participation in this process, HCI may, of course, reserve all rights to object to this Court's conclusions in this case, as it has done throughout the briefing on the issues addressed in this Order.

parties believe will most efficiently result in the entry of judgment. If the parties are able to reach an agreement, the Court would welcome a stipulation and proposed order reflecting that agreement. If the parties cannot reach an agreement, then Norick's counsel shall inform the Court of the parties' proposals, and the Court will issue further appropriate orders.

**IT IS SO ORDERED.**

Date: November 13, 2024                    *s/Katherine Menendez*
                                           Katherine Menendez
                                           United States District Judge